**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MELVIN MEDINA and CATHERINE MEDINA, | : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | NO. 14-1010 |
| RAND BEERS, Acting Secretary, Department of Homeland Security, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S. J. November 5, 2014

Currently pending before the Court is (1) the Motion for Partial Summary Judgment and Motion to Partially Dismiss by Defendants Rand Beers, Acting Secretary, Department of Homeland of Security; Jeh Johnson, Secretary of the U.S. Department of Homeland Security; Lori Scialaba, Acting Director of U.S. Citizenship and Immigration Services ("USCIS"); and Evangelia Klapakis, Director of the Philadelphia USCIS District Office (collectively "Defendants"); and (2) the Motion for Summary Judgment by Plaintiffs Melvin Medina and Catherine Medina. For the following reasons, Plaintiffs' Motion is granted and Defendants' Motion is denied.

## I. FACTUAL BACKGROUND

The factual record in this case is closed and the parties agree to the facts pertinent to this dispute. Plaintiff Melvin Medina,[1] a native and citizen of Honduras, entered the United States

---

[1] Although both Melvin Medina and Catherine Medina are plaintiffs in this case, for the sake of clarity, the Court will refer only to Mr. Medina as "Plaintiff" and will refer to all of

without inspection on October 9, 1992. (Administrative Record ("AR") 306–07.) On January 5, 1999, the United States Attorney General designated Honduras under the Temporary Protected Status ("TPS") program after the country experienced a hurricane. Department of Justice Notice 64 Fed. Reg. 524-02 (January 5, 1999). In 1999, Plaintiff Medina applied for and was granted Temporary Protected Status. (AR 213–24.) As a TPS beneficiary, he remains both protected from removal and eligible for employment in the United States. 8 U.S.C. § 1254a(a)(1). Over the ensuing years, the Attorney General periodically extended TPS eligibility for Honduran nationals, with the latest extension being given on October 16, 2014. Dept. of Homeland Security Notice, 79 FR 62170-02 (Oct. 16, 2014). Plaintiff Medina has re-registered as necessary. (AR 367–72.)

On January 2, 2002, Plaintiff married Catherine Medina, a United States citizen, and they currently have three children together. (AR 37, 97.) In December 2011, Mrs. Medina filed a Form I-130 "Petition for Alien Relative" on Plaintiff's behalf with the United States Citizenship and Immigration Service ("USCIS"). (AR 92.) Concurrently with that petition, Medina filed a Form I-485 to adjust his status to "lawful permanent resident." (AR 34–41.) Section 1255(a) of Title 8 of the United States Code provides that "[t]he status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is

---

Plaintiff's submissions in the singular form.

filed." 8 U.S.C. § 1255(a).

USCIS made several requests for additional evidence to address Plaintiff's eligibility for adjustment of status, all of which were responded to by Plaintiff. (Compl., Exs. 3–5.) In addition, on May 8, 2012, Plaintiff appeared for a scheduled interview to provide sworn testimony in connection with his application. (AR 25.) After approximately five months of no action on the two petitions, Plaintiff visited the local USCIS office in Philadelphia to inquire into the status of his case. (Compl. ¶ 20.) Shortly thereafter, on October 18, 2012, USCIS issued a notice of its intent to deny ("NOID") Plaintiff's adjustment status under 8 U.S.C. § 1255(a). (AR 25–26.) This notice stated, in pertinent part:

> While Section 245(i) of the Act allows those who entered the United States without inspection to adjust their status, you have provided no evidence that you were physically present in the United States on December 21, 2000, or that a petition for classification under section 204 was filed with the Attorney General on or before April 30, 2001.
>
> In addition, Title 8, Code of Federal Regulations, Part 211.10(f)(2) determines that an alien shall be issued a notice with regards to his or her rights under temporary protective status. Title 8, Code of Federal Regulations Part 244.10(f)(3) also limits the benefits under this status. The benefits contained in the notice are the only benefits the alien is entitled to under Temporary Protective Status. The temporary protective status accorded you allowed you to remain in the United States during the time that such status was in affect [sic], and to have such regarded as lawful stay in this country. However, such accorded status did not remedy the fact that you were not properly inspected and admitted or paroled into the United States.
>
> Therefore, you appear to be statutorily ineligible for adjustment of status under Section 245(a) because you entered without inspection. In addition, you appear to be ineligible to adjust your status under the provisions of Section 245(i) of the Act because no proof of physical presence on December 21, 2000, was provided and no petition appears to be filed on your behalf on or prior to April 30, 2001. As such, USCIS is providing you with this notice of its intent to deny your case or present evidence to support your eligibility under section 245(I).

(AR 26.)

On November 15, 2012, Plaintiff responded to the NOID, arguing that the plain language of the statute in question authorized his classification as an individual in and maintaining lawful status as a non-immigrant, and thus eligible for adjustment of status. (AR 22–24.) He specifically relied on the provision at 8 U.S.C. § 1254a(f)(4), which provides that "for purposes of adjustment of status under section 245 and change of status under section 248, the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant." (AR 22 (citing 8 U.S.C. § 1254a(f)(4)).) Six months after Plaintiff's response, on May 16, 2013, the USCIS finally issued a denial of the adjustment of status application. (AR 7–9.) This denial reiterated the reasons set forth in the NOID. (Id.) In addition, it stated that, "[i]n that you failed to respond to the Notice of Intent to Deny mailed to you by the USCIS on October 18, 2012, your application that was filed on December 8, 2011, is considered abandoned and is hereby denied." (Id. at 9.)

On June 5, 2013, Plaintiff sent a letter to USCIS stating that the application had not been abandoned because he had responded to the Notice of Intent to Deny. (AR 5.) In addition, he attached a copy of a recent Sixth Circuit decision in Flores v. USCIS, 718 F.3d 548 (6th Cir. June 4, 2013), as support for his position. (Id.) USCIS did not respond to this letter.

On February 21, 2014, Plaintiff initiated the current civil proceedings, setting forth claims for relief under the Administrative Procedures Act, the mandamus statute, and the Due Process Clause. Subsequently, USCIS reopened its May 16, 2013 decision and issued a Superseding Decision. (AR 1–4.) In this decision, the Government remarked that the Notice of Denial stating that Plaintiff had abandoned his application to adjust status was issued in error due to the agency's failure to place his November 2012 response in the file. (Id. at 1.) Nonetheless, USCIS

still denied his application based on an administrative decision in Matter of Sosa-Ventura, 25 I. & N. Dec. 391 (BIA 2010), and an Eleventh Circuit decision in Serrano v. U.S. Attorney General, 655 F.3d 1260, 1285 (11th Cir. 2011).

On February 19, 2014, Plaintiff initiated the current federal action in this Court. Following the Superseding Decision, Plaintiff filed an Amended Petition for Writ of Mandamus and Complaint for Declaratory Judgment. On June 2, 2014, Defendants filed a Motion for Partial Summary Judgment and a Motion to Dismiss for Failure to State a Claim. Plaintiffs responded on August 5, 2014 and filed their own Motion for Summary Judgment on the same date. Also on August 5, 2014, the American Immigration Council and the Northwest Immigrant Rights Project filed an *amicus curiae* brief on behalf of Plaintiffs. On August 22, 2014, Defendants responded to Plaintiffs' Motion and objected to the filing of the *amicus* brief. The case is now ripe for judicial review.

## II. CROSS-MOTIONS FOR SUMMARY JUDGMENT ON ADMINISTRATIVE PROCEDURES ACT CLAIM

### A. Standards of Review

#### 1. Summary Judgment Standard of Review

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

**2. Standard for Judicial Review of Administrative Agency Decision**

The scope of judicial review of agency rulemaking under the Administrative Procedures

Act "arbitrary and capricious" standard is "narrow, and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Although a reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given," it may nevertheless "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Id. A court may conclude that a regulation is arbitrary and capricious only "if the agency relied on facts other than those intended by Congress, did not consider 'an important aspect' of the issue confronting the agency, provided an explanation for its decision which 'runs counter to the evidence before the agency,' or is entirely implausible." Rite Aid of Pa., Inc. v. Houstoun, 171 F.3d 842, 853 (3d Cir. 1999).

Nonetheless, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." Chevron, U.S.A., Inc. v. Nat'l Res. Defense Council, Inc., 467 U.S. 837, 843 n.9 (1984). Chevron deference involves a two-step inquiry. At step one, the court must determine "whether Congress has directly spoken to the precise question at issue" and "unambiguously expressed [its] intent." Id. at 842–43. If so, the inquiry ends, as both the agency and the court must give effect to the plain language of the statute. Id. at 842–43 & n. 9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."). When "the statute is silent or ambiguous with respect to the specific issue," the court proceeds to step two, where it inquires whether the agency's "answer is based on a permissible construction of the statute." Id. at 843. "If a statute is ambiguous [or silent], and if the implementing agency's construction is reasonable, Chevron requires a federal court to accept the agency's construction of the statute,

even if the agency's reading differs from what the court believes is the best statutory interpretation." Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005) (citing Chevron, 467 U.S. at 843–44 & n.11). "[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" Immigration and Naturalization Serv. v. Aguirre–Aguirre, 526 U.S. 415, 425 (1999) (quoting Immigration and Naturalization Serv. v. Abudu, 485 U.S. 94, 110 (1988)). Courts also "afford Chevron deference to the [Board of Immigration Appeal's] reasonable interpretations of statutes which it is charged with administering." Kamara v. Attorney Gen. of U.S., 420 F.3d 201, 211 (3d Cir. 2005) (citing Aguirre–Aguirre, 526 U.S. at 424 and Chevron, 467 U.S. at 842).

**B. Discussion**

Both Plaintiff and Defendants move for summary judgment on Plaintiff's claim for declaratory judgment under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A) & (B). The parties agree that the sole issue in this matter is one of law: whether the grant of temporary protected status is sufficient to meet the requirement of being "inspected and admitted or paroled into the United States," for purposes of adjustment of status under 8 U.S.C. § 1255(a). For the reasons which follow, the Court finds that the grant of temporary protected status under 8 U.S.C. § 1254a(f)(1) satisfies § 1255(a)'s "inspected and admitted or paroled" prerequisite.

**1. Relevant Statutory Provisions**

As set forth above, Plaintiff was given Temporary Protected Status ("TPS") pursuant to the Secretary of Homeland Security's authority to designate certain nationals of a foreign state as

eligible for TPS in cases of ongoing armed conflict, environmental disaster, or other "extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety." 8 U.S.C. § 1254a(b)(1). TPS is explained in 8 U.S.C. § 1254a(f), as follows:

> During a period in which an alien is granted temporary protected status under this section–
>
> (1) the alien shall not be considered to be permanently residing in the United States under color of law;
>
> (2) the alien may be deemed ineligible for public assistance by a State (as defined in section 1101(a)(36) of this title) or any political subdivision thereof which furnishes such assistance;
>
> (3) the alien may travel abroad with the prior consent of the Attorney General; and
>
> (4) for purposes of adjustment of status under section 1255 of this title and change of status under section 1258 of this title, the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant.

8 U.S.C.A. § 1254a(f).

Adjustments of status are governed by 8 U.S.C. § 1255. Section 1255(a) provides, in relevant part, as follows:

> The status of an alien *who was inspected and admitted*[2] or paroled into the United States . . . *may be adjusted* by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C.A. § 1255(a) (emphasis added). Notably, applicants are generally barred from receiving

---

[2] "The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C.A. § 1101(a)(13)(A)

an adjustment of status to lawful permanent resident pursuant to § 1255(a) if the alien:

> continues in or accepts unauthorized employment prior to filing an application for adjustment of status or who is in unlawful immigration status on the date of filing the application for adjustment of status or who has failed (other than through no fault of his own or for technical reasons) to maintain continuously a lawful status since entry into the United States.

8 U.S.C.A. § 1255(c)(2).

**2. Statutory Interpretation**

Where there is a dispute over the meaning of a statute, the inquiry begins with the plain language of the statute itself. U.S. v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989). The best evidence of Congress' intent is the text of the statute. W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 98 (1991). To make a determination about the meaning of a statute, the court must look "not only to the particular statutory language, but to the design of the statute as a whole and its object and policy." U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1155 (3d Cir. 1991) (quoting Crandon v. U.S., 494 U.S. 152, 158 (1990)); see also U.S. v. Schneider, 14 F.3d 876, 879 (3d Cir. 1994)

Under the plain language of 8 U.S.C. § 1255, an alien seeking adjustment of status to lawful permanent resident status must initially show that he or she was "inspected and admitted or paroled into the United States." Id. Thereafter, the alien must (1) have made an application for an adjustment; (2) be eligible to receive an immigrant visa and be admissible to the United States for permanent residence; and (3) have an immigrant visa immediately available to him at the time his application is filed. Id. The parties do not dispute that Plaintiff, in this matter, satisfies the latter three requirements. Rather, they focus on whether Plaintiff has met the threshold requirement of being "inspected and admitted or paroled into the United States."

Plaintiff asserts that he has satisfied this requirement by virtue of his TPS because, under 8 U.S.C. § 1254a(f)(4), "[d]uring a period in which an alien is granted temporary protected status under this section . . . for purposes of adjustment of status under section 1255 of this title . . . the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant." Id. He contends that, given § 1254a's direct reference to § 1255, the term "considered as being in, and maintaining, lawful status as a nonimmigrant" equates to being "inspected and admitted or paroled in the United States."

Defendants, on the other hand, urge a contrary interpretation. They assert that the threshold requirement of being "inspected and admitted or paroled into the United States" cannot be satisfied by the mere fact of TPS and that nothing in § 1254a(f)(4)'s language indicates that the provision addresses § 1255(a)'s eligibility requirements. According to Defendants, the fact that these statutory provisions use different terms—§ 1255(a) refers to "inspected and admitted or paroled" while § 1254a(f) refers to whether an applicant is "in, and [has] maintain[ed], lawful status"—suggest that Congress meant to discuss two different things. Defendants conclude that, by its plain language, § 1254a(f)(4) provides no path to adjustment for aliens who were never "inspected and admitted or paroled."

While decisions are sparse, the appellate courts facing this identical issue have reached starkly different results. In Serrano v. United States Attorney General, 655 F.3d 1260 (11th Cir. 2011), the Eleventh Circuit sided with Defendants' interpretation. The plaintiff was an alien and citizen of El Salvador who illegally entered the United States in 1996 without being inspected and admitted or paroled. Id. at 1263. He registered for Temporary Protected Status ("TPS") in 2001 and re-registered in 2006, 2008, and 2009. Id. In 2006, he married a U.S. citizen. Id. In

2008, his wife filed a Form I-130, "Petition for Alien Relative" on his behalf, and he concurrently filed a Form I-485 seeking to adjust his status to lawful permanent resident. Id. The Department of Homeland Security ("DHS") denied his application, finding that because he entered the U.S. illegally in 1996, without having been admitted or paroled, he was not eligible for adjustment of status under 8 U.S.C. § 1255(a). Challenging that decision, the plaintiff filed suit in federal court, arguing that 8 U.S.C. § 1254a(f)(4) alters the admission requirements set forth in 8 U.S.C. § 1255(a), thereby allowing him to adjust his status to lawful permanent resident based on his current Temporary Protected Status. Id. With little written analysis of the statutory language, the Eleventh Circuit held that "[t]he plain language of § 1255(a) limits eligibility for status adjustment to an alien who has been inspected and admitted or paroled . . . . That an alien with Temporary Protected Status has 'lawful status as a nonimmigrant' for purposes of adjusting his status does not change § 1255(a)'s threshold requirement that he is eligible for adjustment of status only if he was initially inspected and admitted or paroled." Id. at 1265.

Approximately twenty months later, however, the Sixth Circuit issued a contrary decision in Flores v. United States Citizenship and Immigration Services, 718 F.3d 548 (6th Cir. 2013). In that case, the plaintiff was a citizen of Honduras who entered the United States without inspection in March 1998. Id. at 550. On September 3, 1999, he was granted TPS, which had been continuously renewed since then due to his good moral character. Id. In August 2010, he married an American citizen and they jointly sought an adjustment of his status to lawful permanent resident. Id. The plaintiff's application for adjustment was denied because he "entered the United States without inspection," and thus could not satisfy § 1255's prerequisite

of inspection. Id. at 550–51. The Sixth Circuit disagreed with the Government's statutory interpretation, reasoning that the plain language of § 1254a(f)(4) demonstrates that an alien who was granted TPS after an illegal entry into the United States, and otherwise meets the other requirements set forth in § 1255(a), is eligible for adjustment. Id. at 553. Specifically, the court interpreted § 1254a(f) "exactly as written—as allowing [the plaintiff] to be considered as being in lawful status as a nonimmigrant or purposes of adjustment of status under § 1255." Id. at 552.

In that case, the Government argued that the statement in § 1254a(f) regarding status as a lawful nonimmigrant pertained only to § 1255(c)(2)—a subsection of the adjustment of status statute that precludes adjustment of status to lawful permanent resident if an immigrant works without authorization in this country. Id. at 553. The court rejected that argument as "unduly narrow" and ignoring the plain language of the statute. Id. The court explained that "[w]e see no reason why Congress would have written the exception in § 1254a(f) in § 1254a(f) the way it did if it actually has to do only with § 1255(c)(2)—a quite specific reference—rather than what the statute actually says, which is '§ 1255.'" Id. As such, the court determined that the language of § 1254a was written to apply to § 1255 as a whole. Id.

The court also rejected the Government's argument that the Attorney General had no authority to exercise discretion and adjust status for immigrants similar to the plaintiff. Id. The court remarked that § 1254a(c)(2)(A)(iii)(I–III) imposes limits on the Attorney General's discretion with respect to specific groups of people—certain criminals and former Nazis—but does not mention TPS beneficiaries as a group prohibited from discretionary belief, suggesting that Congress did not intend to strip the Attorney General of discretion to waive admissibility requirements for all TPS beneficiaries. Id. at 553–54. Moreover, the court found that Congress'

apparent intent supported that interpretation since a TPS beneficiary is a member of a class of people that Congress chose to protect due to an extraordinary circumstance. Id. at 554. It noted that the issue was not whether all TPS beneficiaries automatically qualify for adjustment under § 1255, but rather whether TPS beneficiaries who have been deemed to have good moral character and have visas available to them on an independent basis can qualify for consideration of adjustment of status under § 1255 despite initially entering the country without inspection. Id.

In rationalizing its interpretation, the Sixth Circuit accorded no deference to the agency interpretation offered by the Government because it was at odds with the plain language of the statute. Id. at 554–55. It further distinguished the Eleventh's Circuit reasoning in Serrano, noting that the plaintiff in that matter, unlike the plaintiff before the court, had not disclosed his illegal entry into the United States on his application for TPS. Id. at 555. As such, the grant of TPS in Serrano did not function to satisfy the "inspected and admitted or paroled" portion of § 1255(a). Id.

Finally, the Sixth Circuit found that policy considerations supported its interpretation. It reasoned as follows:

> Mr. Suazo seems to be the exact type of person that Congress would have in mind to allow adjustment of status from TPS beneficiary to LPR. He has been in the United States for about fifteen years. He has roots here. His wife and minor child are here. They are both United States citizens. He is of good moral character and a contributing member of society. He has waited his turn for an independent, legal, and legitimate pathway to citizenship, through the immediate relative visa application. If the statutes are interpreted as the Government argues they should be, the result would be absurd. The Government is essentially telling him that he is protected and can stay here, but that he will never be allowed to become an LPR, even for an independent basis. Under the Government's interpretation, Mr. Suazo would have to leave the United States, be readmitted, and then go through the immigration process all over again. This is simply a waste of energy, time, government resources, and will have negative effects on his family—United States

> citizens. We are disturbed by the Government's incessant and injudicious opposition in cases like this, where the only purpose seems to be a general policy of opposition for the sake of opposition.

Id. at 555–56; see also U.S. v. Orellana, 405 F.3d 360, 366 (5th Cir. 2005) ("Here, Orellana entered the country without inspection, making his initial presence unlawful. However, he subsequently applied for and was granted TPS. As a result, Orellana was granted protection from removal, authorized to seek employment, and given the ability to apply for adjustment of status as if he were in lawful non-immigrant status."); Ramirez v. Dougherty, ___ F. Supp. 2d ___, No. Civ.A.13-1236, 2014 WL 2439819 (W.D. Wash. May 30, 2014) (adopting reasoning and conclusion of Flores).

In the present case, this Court—having thoroughly reviewed the statutes and relevant jurisprudence—is in full agreement with the Sixth Circuit's interpretation. The language of the relevant provisions is clear. "During a period in which an alien is granted temporary protected status under this section . . . *for purposes of adjustment of status under section 1255* of this title and change of status under section 1258 of this title, the alien shall be considered as *being in, and maintaining, lawful status as a nonimmigrant*." 8 U.S.C. § 1254a(f) (emphasis added). By its clear terms, § 1254a(f)(4) applies to the entirety of § 1255 and thereby satisfies the "inspected and admitted or paroled" prerequisite of § 1255(a). In turn, a TPS beneficiary who applies for adjustment of status, is eligible for an immigrant visa, and has an immigrant visa immediately available to him qualifies for the discretionary adjustment of status under § 1255(a).

The Court deems Defendants' numerous contrary arguments unconvincing. **First,** Defendants contend that § 1254a(f)(4) uses the term "lawful status as a nonimmigrant," while § 1255(a) uses the term "inspected and admitted or paroled," suggesting, under canons of

statutory construction, that Congress intended to convey different meanings for these words. They go on to assert that the terms "admission" and "admitted" are defined in the statute to mean "with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). The Third Circuit, in Hanif v. Attorney General of United States, 694 F.3d 479 (3d Cir. 2012), reasoned that "admission" was "the physical event of entering the country" and not the "gaining [of] a new status." Id. at 485. In Taveras v. Attorney General of United States, 731 F.3d 281 (3d Cir. 2013), cert. denied, 134 S. Ct. 1551 (2014), the Third Circuit similarly interpreted "admission" to mean "physical entry at a border." Id. at 291 n.10. Under such definitions, Defendants conclude that obtaining "lawful status as a nonimmigrant" cannot equate to physical admission.

The Court finds several problems with this argument. Although the definitions of "admission" and "admitted" under 8 U.S.C. § 1101(a)(13)(A) and Third Circuit jurisprudence, taken in isolation, would lend support to the Government's arguments, "[t]he immigration statutes use the words 'admitted' and 'admission' inconsistently." Roberts v. Holder, 745 F.3d 928, 932 (8th Cir. 2014). Neither Hanif nor Taveras discussed the meaning of the term "admitted" in the context of 8 U.S.C. § 1255.[3] Indeed, § 1255 itself undermines the position that "admitted" must mean a physical entry into the country after inspection by an immigration officer. Section 1255(b) states that "[u]pon the approval of an application for adjustment made under subsection (a) of this section, the Attorney General shall record the alien's lawful

[3] Both Hanif and Tavares discussed the meaning of the term "admitted" in the context of whether an alien was eligible for relief from removal under 8 U.S.C. § 1182(h). Neither dealt with the meaning of the term "admitted" in the context of § 1255(a). As such, neither case is controlling on the issue presently before this Court.

admission for permanent residence as of the date the order of the Attorney General approving the application for the adjustment of status is made." 8 U.S.C. § 1255(b). Thus, "[s]ection 1255(b) treats adjustment itself as an 'admission' by directing the Attorney General to record 'admission' as the date the alien adjusts his status." Roberts, 745 F.3d at 933 (emphasis omitted).[4] The Board of Immigration Appeals has similarly read immigration statutes as treating post-entry adjustment as a substitute for port-of-entry inspection. See Matter of Koljenovic, 25 I. & N. Dec. 219, 221 (BIA 2010) ("Adjustment of status is essentially a proxy for inspection and permission to enter at the border, which is given as a matter of administrative grace."); Matter of Alyazji, 25 I. & N. Dec. 397, 399 (BIA 2011) (treating adjustment of status as admission under immigration laws). In other words, the Board has found that admission can occur subsequent to actual entry into the United States.

Having thus found that "admission" can occur in a manner other than by physical entry and inspection, the Court must next determine whether the grant of TPS constitutes such "admission" for purposes of § 1255(a). As repeatedly noted above, § 1254a(f) provides that "[d]uring a period in which an alien is granted temporary protected status under this section . . . for purposes of adjustment of status under section 1255 of this title and change of status under section 1258 of this title, the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant." Id. Under the immigration laws, the process obtaining of "nonimmigrant"

---

[4] The Third Circuit has disagreed and remarked that "[w]e perceive the recording requirement of § 1255(b) to be a ministerial provision relating to the monitoring and control of the number of visas available in any given year, rather than an effort by Congress to amend the definitions of 'admitted' and 'lawfully admitted for permanent residence' set forth in § 1101(a)." Hanif, 694 F.3d at 485. Again, however, the Third Circuit was not interpreting § 1255 in the same context as the current case.

status requires the "admission" of the alien. See 8 U.S.C. § 1184(a)(1) ("The *admission* to the United States of any alien as a nonimmigrant . . .") (emphasis added); Adusumelli v. Steiner, 740 F. Supp. 2d 582, 591 (S.D.N.Y. 2010) ("Nonimmigrant aliens are *admitted* to the United States only for the duration of their status") (quotations omitted) (emphasis added), aff'd 686 F.3 66 (2d Cir. 2012); Najafi v. Civiletti, 511 F. Supp. 236, 239 (W.D. Mo. 1981) ("Nonimmigrant aliens . . . are *admitted* into the United States for some specific purpose, e.g., work, school, tourism, etc., and only "for such time and under such conditions as the Attorney General may by regulations prescribe.") (emphasis added). Indeed, the presumption is that every alien "shall be presumed to be an immigrant until he establishes to the satisfaction of the consular officer, at the time of application for a visa, and the immigration officers, at the time of application for admission, that he is entitled to a nonimmigrant status under section 1101(a)(15) of this title." 8 U.S.C. § 1184(b). In other words, by the very nature of obtaining nonimmigrant status, the alien goes through inspection by a consular officer and is deemed "admitted." In turn, by providing that, for purposes of adjustment of status under § 1255, a person under TPS shall be considered as "being in, and maintaining, lawful status as a nonimmigrant," § 1254a(f)(4) clearly states that a person under TPS is deemed to have satisfied all of the requirements of nonimmigrant status, including that of admission after inspection. See U.S. v. Ochoa-Colchado, 521 F.3d 1292, 1296 (10th Cir. 2008) (noting that an alien who has acquired unlawful status by illegally crossing the border without admission or parole cannot relinquish that illegal status until he or she is granted TPS, which allows the alien to be "considered as being in, and maintaining, lawful status as a

nonimmigrant" for limited purposes).[5]

**Second**, Defendants argue that if "inspected and admitted or paroled" meant the same thing as "being in, and maintaining, lawful status," there would be no need for § 1255 to separately refer to admission or parole as a threshold requirement in subsection (a), and to the failure to maintain lawful status as a bar to eligibility in subsection (c)(2). This argument disregards the clear distinction between these two provisions. Once an alien is inspected and admitted or paroled, he or she satisfies the threshold requirement for § 1255(a). For purposes of § 1255(c)(2), however, if the alien has not maintained lawful status—notwithstanding the lawfulness of the original admission—he or she becomes ineligible for adjustment. For purposes of an alien under TPS, the requirement of being "inspected and admitted or paroled" is satisfied by § 1254a(f)'s giving of lawful status as a nonimmigrant. The failure to maintain that status—by failing to re-register for TPS or by otherwise making him or herself ineligible for TPS—would be grounds for denying an adjustment to lawful permanent resident status.

**Third**, Defendants assert that the plain language of the relevant provisions demonstrates that § 1254(a)(f)(4) does not address section 1255 as a whole, but rather only the bar to adjustment of status in § 1255(c)(2). As noted above, this section provides that "an alien . . . who is in unlawful immigration status on the date of filing the application for adjustment of status or who has failed (other than through no fault of his own or for technical reasons) to

---

[5] Defendants cite Jin Qing Wu v. Holder, 705 F.3d 1, 2 (1st Cir. 2013) to support their interpretation that the beneficiary of an I-130 petition must still demonstrate that he entered with inspection to be eligible to adjust under § 1255(a). That case, however, is inapplicable as the plaintiff was not under TPS and, therefore, did not have the benefit of § 1254a(f). The same holds true for Defendants' citation of Syed v. Klapakis, No. Civ.A.11-7127, 2013 WL 789543, at *5–6 (E.D. Pa. Mar. 4, 2013), as the TPS provisions were not involved in that matter.

maintain continuously a lawful status since entry into the United States," shall not be permitted to adjust his or her status under § 1255(a). 8 U.S.C. § 1255(c)(2). Defendants argue that because § 1254a(f)(4) parallels the language in § 1255(c)(2), § 1254a(f)(4) was clearly meant to address the bar to eligibility for those applicants who fail to maintain lawful status.

This argument, however, fails on multiple levels. Primarily, Defendants' interpretation reads nonexistent language into § 1254a. Section 1254a(f)(4) specifically states "for purposes of adjustment of status under section 1255 of this title . . . ." 8 U.S.C. § 1254a(f)(4). Had Congress intended that this provision apply only to § 1255(c)(2), it would have said so. Instead, it deliberately gave broad application to § 1254a(f) by having it apply to all of § 1255, which would, by necessity, include § 1255(a). Moreover, § 1254a(f)(4) does not precisely track the language of § 1255(c)(2). The former refers to a TPS beneficiary having lawful status as a "nonimmigrant," which is a very specific type of status entailing admission by a customs officer under such designation, while the latter refers to "maintain[ing] continuously a lawful status," without specifying any particular type of lawful status. Therefore, for Defendants' argument to be correct, § 1254a(f)(4) would have simply said that "for purposes of § 1255(c)(2)," an alien under TPS "shall be considered as being in, and maintaining, lawful status." The exclusion of a reference to subsection (c)(2) and the inclusion of the word "nonimmigrant" can only suggest that Congress meant, "for purposes of adjustment of status under section 1255," to designate TPS beneficiaries as "nonimmigrants" so that such beneficiaries would be deemed inspected and admitted or paroled for purposes of adjustment of status.[6]

---

[6] The parties raise numerous arguments regarding the definition of "maintaining lawful status." The key phrase at issue here, however, is the phrase set forth in § 1254a(f)(4) —"maintaining lawful status *as a nonimmigrant.*" To the extent the parties do not acknowledge

Above all, Defendants' argument simply makes no sense given the entire statutory scheme. Defendants contend that § 1254a(f)(4) was meant to cure the bar to adjustment eligibility for TPS beneficiaries so that they are not deemed to be in "unlawful status" under § 1255(c)(2), yet assert that, despite that cure, there is no path to adjustment for a TPS beneficiary that does not entail leaving the country and re-engaging in the consular process. Under Defendants' theory, § 1254a(f)(4) does not address the latter portion of § 1255(c)(2), which bars eligibility or adjustment for aliens who have failed to maintain a continuously lawful status since entry into the United States. Stated more simply, under Defendants' position, § 1254a(f)(4) would help TPS beneficiaries avoid part of the bar to adjustment set forth in § 1255(c)(2), but would neither help such beneficiaries satisfy the "inspected and admitted" prerequisite nor cure the remainder of the bar for those not in continuously lawful status. This is especially true given the fact that many TPS beneficiaries entered the country illegally and maintained some period of illegal residence in the United States prior to applying for and being granted TPS. In sum, pursuant to Defendants' interpretation, § 1254a(f)(4) would essentially be a meaningless provision, thereby violating a fundamental rule of statutory construction.[7] In re

---

that additional language, their arguments are inapposite.

[7] In the June 12, 2014 Board of Immigration Appeals ("BIA") decision attached as Exhibit B to Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment, the BIA sided with Defendants' proposed interpretation of the statutes at issue. The panel, in that matter, found that § 1254a(f) "is best understood as intending to ameloriate the adverse consequences to TPS grantees who fail, due to circumstances beyond their control, to maintain nonimmigrant status obtained by inspection and admission at the border. Other than immediate relatives of United States citizens and those eligible for the benefits of section 245(i) of the Act, an applicant for change of status must be 'continuing to maintain' a lawful nonimmigrant status in order to be eligible for that benefit." (Defs.' Resp. Opp'n Summ. J., Ex. B at 6.) It went on to reason that "in our view, section 244(f)(4) of the Act preserves the ability of TPS grantees who were admitted to the United States in valid nonimmigrant status, and who were subsequently

Fesq, 153 F.3d 113, 115 (3d Cir. 1997) ("As a general rule of statutory construction '[w]e strive to avoid a result that would render statutory language superfluous, meaningless, or irrelevant.'") (quoting Cushman v. Trans Union Corp., 115 F.3d 220, 225 (3d Cir. 1997)). This problem is cured by giving § 1254a(f)(4) the construction urged by Plaintiff—*i.e.,* that for purposes of applying for adjustment of status, TPS allows an alien to be deemed a lawful nonimmigrant, thereby both satisfying the "inspected and admitted" requirement and avoiding the bar on those who failed to maintain continuous lawful status.[8]

**Fourth**, Defendants assert that Plaintiff's interpretation of the statutory language conflicts with portions of § 1255 that (1) expressly address adjustment of status for TPS beneficiaries; and (2) exempt other categories of applicants from § 1255(a)'s "inspected and admitted or paroled" requirement. As to the first part, they contend that Plaintiff's interpretation would render

---

unable to leave the United States in compliance with the terms of their admission due to dangerous circumstances in their country of origin, to adjust and change status; it does not provide for a new benefit to aliens who were ineligible for such benefit prior to the grant of TPS." (Id.)

This decisions ascribes an extraordinarily complicated meaning to a rather simple provision. Section 1254a(f)(4) states that "for purposes of adjustment of status under section 1255 of this title . . . the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant." 8 U.S.C. § 1254a(f)(4). It does not state that for nonimmigrants who lawfully entered the United States and who somehow failed to maintain their nonimmigrant status, for reasons beyond their control, prior to being given TPS, such failure to maintain their status shall be waived for purposes of an application to adjust their status under § 1255(c)(2). Had Congress meant for this provision to have such a specific and limited purposes, it would not have used such broad, overarching language.

[8] Defendants contend that, even taking Plaintiff's interpretation as accurate, § 1254a(f)(4) does not provide complete relief from ineligibility for adjustment because, to avoid § 1255(c)(2), a foreign national must "maintain continuously a lawful status since entry into the United States." 8 U.S.C. § 1255(c)(2). The Court disagrees. By stating that a TPS beneficiary shall be deemed as "being in and maintaining" lawful nonimmigrant status, Congress deems the date of entry to be the date of the grant of TPS.

Congress' insertion of language regarding adjustment of status for TPS beneficiaries a nullity. Under 8 U.S.C. § 1254a(h), the United States Senate is precluded from considering any bill, resolution, or amendment that provides for adjustment to lawful temporary or permanent resident alien status for any alien receiving temporary protected status under this section unless it does so by a three-fifths vote. 8 U.S.C. § 1254a(h). By its plain terms, however, this section has nothing to do with whether an alien under TPS may qualify for adjustment of status by the Attorney General. Rather, this section is merely a limitation on *Congress'* power to act with respect to aliens who have their TPS removed. More specifically, the Attorney General retains the authority to grant a state temporary protected status and to subsequently terminate a state's designation if the state no longer meets the conditions under which it was designated. Upon termination of designation, then, aliens previously under the TPS designation are immediately deportable. Subsection (h) makes it difficult for Congress to intervene in such a decision to remove TPS and deport affected aliens. In other words, subsection (h) "grants a major concession to the Executive Branch by limiting the ability of the Senate to consider legislation that would adjust the immigration status of TPS aliens. Essentially, Congress pledged that it would not legislatively adjust temporary protection to permanent status [without a three-fifths majority]" for aliens who were suddenly facing loss of TPS and had not obtained adjustment of status. Ari Weitzhandler, "Temporary Protected Status: The Congressional Response to the Plight of Salvadoran Aliens," 64 U. Colo. L. Rev. 249, 269 (1993). This section says nothing about whether an alien, who is under valid TPS protection, may apply for and obtain an

adjustment of status through the normal channels of § 1255(a).[9]

Defendants also argue that Plaintiff's interpretation of the statutory language conflicts with the portion of § 1255 that exempts other categories of applicants from § 1255(a)'s "inspection and admission or parole" requirement. Specifically, § 1255(h)(1) provides that certain juvenile immigrants "shall be deemed, for purposes of [§ 1255(a)] to have been paroled into the United States" regardless of whether those juveniles entered the United States without inspection. 8 U.S.C. § 1255(h)(1). Moreover, § 1255(a) exempts from the "inspected and admitted or paroled" requirement applicants covered by the Violence Against Women Act ("VAWA"). Based on such provisions, Defendants argue that "if Congress intended that TPS beneficiaries would satisfy section 1255(a)'s threshold requirements, it knew how to state as much with clear language." (Defs.' Mem. Supp. Summ. J. 12.) Again this argument compares apples to oranges. Those provisions deal with Congress' ability or intent to allow whole classes of aliens to qualify for adjustment of status based on certain circumstances. As pointed out by the Sixth Circuit, however, "[t]he issue [here] is not whether all TPS beneficiaries automatically qualify for LPR adjustment under § 1255." Flores, 718 F.3d at 554. Rather, it is whether a TPS beneficiary, who applies for adjustment of status, is eligible to receive an immigrant visa and is admissible to the United States for permanent residence through good moral character, and has an immigrant visa immediately available to him at the time his application is filed (*i.e.,* the three

[9] Defendants point to the Cuban Adjustment Act and the Haitian Refugee Immigration Fairness Act of 1998 as examples of situations where Congress acted with special legislation to allow large classes of individuals to become lawful permanent residents. Plaintiff, however, is not seeking for an interpretation of the statute that would allow *all* TPS beneficiaries to adjust to lawful permanent resident status, but only one that removes a bar for TPS beneficiaries that otherwise satisfy the requirements of § 1255(a).

requirements set forth in § 1255(a)), is qualified for consideration of adjustment of status under § 1255.

**Fifth**, Defendants aver that any attempts to distinguish Serrano are unpersuasive and that the Court should apply that case to the present matter. Again, multiple problems plague this contention. Primarily, Serrano was issued by the Eleventh Circuit and, as such, is not controlling law. Moreover, the Serrano court engaged in a somewhat perfunctory statutory analysis that did not address many of the arguments set forth by Plaintiff in this case. Further, the Sixth Circuit in the subsequently-issued Flores case adequately distinguished Serrano by virtue of the fact that the plaintiff in that matter had never disclosed his illegal entry into the country when he applied for TPS. Serrano, 655 F.3d at 1265 n.4. The Flores court noted that this failure showed that Serrano's illegal entry was not waived by the Attorney General when granting him TPS. Flores, 718 F.3d at 555 n.4. In both Flores and this case, however, the plaintiffs' illegal entries were disclosed, meaning that the grant of TPS constituted the Attorney General's waiver of those entries and was a knowing grant of the full benefits of TPS. Lastly, this Court respectfully disagrees with the Eleventh's Circuit's conclusions and finds the Flores court's thorough analysis of the statutory language and the parties' arguments to be far more convincing.

**Finally**, Defendants argue that their interpretation is consistent with the intentions of Congress. They assert that TPS was designed to create a temporary safe haven from removal for aliens during extraordinary conditions preventing a safe return to the aliens' home countries. Citing to TPS's history in the plight of visiting Chinese nationals following the Tiananmen Square massacre in 1989, Defendants contend that TPS was meant to protect the privileges of students in non-immigrant status while ensuring that they were protected from being removed to

this country. In other words, according to Defendants, "Congress meant to ensure that non-immigrants would not put themselves in a worse position by accepting TPS," but did not intend TPS to serve as a cure for purposes of § 1255(a) adjustment for those who entered unlawfully without inspection. (Defs. Mem. Supp. Summ. J. 20.)

The Court disagrees and finds that the policy concerns motivating the creation and extension of TPS supports the interpretation advanced by the Sixth Circuit in Flores. By its strict dictates, TPS is only available to people already in the United States on the date of the designation. 8 U.S.C. § 1254a(c)(1)(a)(i). As such, it cannot be used to provide protection to persons directly affected by an event in their home country and to facilitate their subsequent entry and admission into the United States. In 1999, Honduras was granted eligibility for Temporary Protected Status after suffering multiple natural disasters, including Hurricane Mitch. Ruth Ellen Wasem & Karma Ester, CRS Report for Congress: Temporary Protected Status: Current Immigration Policy and Issues 5 (2005). Only those Honduran nationals who were already present in the United States—whether legally or illegally—were eligible for TPS. Honduras's protection has been repeatedly extended, most recently through to July 5, 2016. Dept. of Homeland Security Notice, 79 FR 62170-02 (Oct. 16, 2014). According to this last extension, "[t]here continues to be a substantial, but temporary, disruption of living conditions in Honduras resulting from Hurricane Mitch, and Honduras remains unable, temporarily, to handle adequately the return of its nationals." Id. This extension, issued in October 2014, also notes that there are approximately 61,000 current Honduras TPS beneficiaries who are expected to file for re-registration and may be eligible to retain their TPS under the extension. Id. That extension provides that eligibility for re-registration requires continuous physical presence in the United

States since January 5, 1999. Id. Accordingly, Honduran citizens currently under TPS must have been physically present in the United States for fifteen years and must have repeatedly met the standards for maintaining such status, including not having committed any crimes and not representing a danger to the country. 8 U.S.C. § 1254a.

While Congress has not, to date, enacted any special legislation or expressed any intention to make all such Honduran TPS beneficiaries eligible for lawful permanent resident adjustment under § 1255, that inaction is irrelevant to the question at issue here. The correct inquiry is whether Congress intended to bar such TPS beneficiaries, who otherwise meet the additional requirements of adjustment under § 1255(a), from becoming eligible for such adjustment. By enacting § 1254a(f), Congress clearly indicated that it did not intend to erect such a bar, as it provided lawful nonimmigrant status to all TPS beneficiaries. To interpret the statutes in the manner suggested by Defendants, the Court would have to find that, despite allowing TPS beneficiaries to remain and work in this country in excess of fifteen years, Congress intended that such beneficiaries could never become lawful permanent residents without physically leaving this country, abandoning families that they have created during their extended stay, quitting their employment that they have been allowed to maintain, and returning to a country that the Attorney General has expressly deemed unsafe, simply in order to undergo the immigration process all over again. In addition, these individuals would have to surrender any entitlement to TPS because, by leaving the country, they would fail to maintain "continuous physical presence" as required by the TPS extension. 79 FR 62170-02. This is particularly true in the case of Plaintiff, as he has been in this country for over twenty years, has a wife and three children who are all United States citizens, (AR 37), and has been lawfully and gainfully

employed as a truck driver. (Id. at 43.) To force him to return to a country that the United States Attorney General has deemed dangerous simply to have Plaintiff physically re-enter the United States is a result that appears to serve no practical purpose.

In short, the Court finds that the unambiguous language of § 1254a(f) means that an alien afforded TPS is deemed to be in lawful status as a nonimmigrant—*i.e.*, has satisfied the requirements for being deemed a nonimmigrant, including inspection and admission—for purposes of adjustment of status under § 1255. Defendants' repeated attempts to twist this basic language into either meaning something extremely specific or applying only to specific portions of § 1255 constitute tortured interpretations that do not comport with a plain language reading. Accordingly, the Court finds that, under §§ 1254a(f)(4) and 1255, an alien that entered the country without inspection, but was subsequently granted TPS, is eligible for readjustment of status so long as he or she meets the other requirements set forth in § 1255(a). Any other interpretation not only distorts congressional intent, but thwarts basic notions of justice.

**3. Deference to Agency Interpretation**

In an alternative argument, Defendants contend that, if this Court determines that the statutory language is ambiguous, it should defer to the agency's interpretation because it is consistent with earlier agency interpretations and constitutes a "well-reasoned interpretation of the interplay between § 1255(a) and § 1254a(f)(4)." (Defs.' Resp. Opp'n Summ. J. 17 (quoting Serrano, 655 F.3d at 1265–66).) Specifically, Defendants assert that the agency's decision is consistent with two opinions of the General Counsel of the former Immigration and Naturalization Service ("INS"), as well as decisions by the Board of Immigration Appeals. Moreover, Defendants assert that the agency's interpretation is consistent with both the limited

purpose of TPS and the legislative history of the TPS statute.

It is well settled that "[t]he first step in interpreting a statute is to determine 'whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" Valansi v. Ashcroft, 278 F.3d 203, 209 (3d Cir. 2002) (quoting Marshak v. Treadwell, 240 F.3d 184, 192 (3d Cir. 2001) (internal citations omitted)). "Where the language of the statute is clear . . . the text of the statute is the end of the matter." Steele v. Blackman, 236 F.3d 130, 133 (3d Cir. 2001). If, however, the language of the statute is unclear, the court should attempt to discern Congress' intent using the canons of statutory construction. Ki Se Lee v. Ashcroft, 368 F.3d 218, 222 (3d Cir. 2004) (citing INS v. Cardoza–Fonseca, 480 U.S. 421, 447–48 (1987)). If the tools of statutory construction reveal Congress' intent, that ends the inquiry. Id. (citing Valansi, 278 F.3d at 208 (quoting Bell v. Reno, 218 F.3d 86, 90 (2d Cir. 2000))). On the other hand, if the court cannot discern Congress' intent using tools of statutory construction, the court should generally defer to the governmental agency's reasonable interpretation. Id.; see generally Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984).

In the present matter, the Court finds that congressional intent as to the meaning of § 1254a(f)(4) is clear. As our holding rests on a plain language reading of the statute, the decision ends here and the Court need not afford deference to the agency's decision. Moreover, even if the statute were somehow ambiguous, the Court agrees with the Sixth Circuit's determination that the agency's decisions are not entitled to deference. Flores, 718 F.3d at 555. As that court noted, under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), the weight of deference, if so given, depends on "the thoroughness evident in [the agency's] consideration, the

validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Flores, 718 F.3d at 555 (quoting Skidmore, 323 U.S. at 140). In this matter, the agency decisions, while consistent with one another, are not validly reasoned and "[b]eing consistently wrong does not afford the agency more deference than having valid reasoning." Id. Accordingly, the Court declines to afford the agency any deference.

#### 4. Conclusion as to APA Claim

Given that the Government misinterpreted the controlling statutes regarding Plaintiff's application for adjustment of status, the Court must find that the agency's ultimate decision was arbitrary and capricious. In turn, the Court reverses the agency's decision and remands to USCIS for further review.

## III. MOTION TO DISMISS CLAIMS BASED ON MANDAMUS STATUTE AND DUE PROCESS CLAUSE

### A. Standard of Review

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P.12(b)(6); see also Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005). In Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. Following these basic dictates, the Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), subsequently defined a two-pronged approach to a court's review of a motion to dismiss. "First, the tenet that

a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Thus, although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678–79.

Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679. "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232–34 (3d Cir. 2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level.'" (quoting Twombly, 550 U.S. at 555)).

**B. Whether the Mandamus Claim and Due Process Claim Should Be Dismissed**

As a primary matter, Defendants seek dismissal of Plaintiff's mandamus claim. The Court agrees. "Before a writ of mandamus may issue, a party must establish that (1) 'no other adequate means [exist] to attain the relief he desires,' (2) the party's 'right to issuance of the writ is clear and indisputable,' and (3) 'the writ is appropriate under the circumstances.'" Hollingsworth v. Perry, 558 U.S. 183, 190 (2010) (quoting Cheney v. U.S. Dist. Court for D.C.,

542 U.S. 367, 380–81 (2004)). "The general principle which governs proceedings by *mandamus* is, that whatever can be done without the employment of that extraordinary writ, *may not be done with it*. It lies only when there is practically *no other remedy*." Helstoski v. Meanor, 442 U.S. 500, 505 (1979) (quotations omitted) (emphasis in original). As Plaintiff has an adequate remedy under the APA's provisions for judicial review, mandamus is unnecessary and the Court dismisses this cause of action.

Plaintiff's procedural due process claim must also be dismissed. Procedural due process is the "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" City of Los Angeles v. David, 538 U.S. 715, 717 (2003) (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976)). In order to successfully establish a prima facie case of a procedural due process violation, a plaintiff must show: "(1) there has been a deprivation of the plaintiff's liberty or property, and (2) the procedures used by the government to remedy the deprivation were constitutionally inadequate." See Mulholland v. Gov't of Cnty. of Berks, No. Civ.A.10–5616, 2012 WL 1057446, at *8 (E.D. Pa. Mar. 29, 2012) (citing Studli v. Children & Youth & Fam. Ctr. Reg'l Office, 346 F. App'x 804, 813 (3d Cir. 2009)), aff'd 706 F.3d 227 (3d Cir. 2013). Remedial procedures will be found to be constitutionally inadequate if "they contain a defect so serious [as to] characterize the procedures as fundamentally unfair." See Leonard v. Owen J. Roberts Sch. Dist., No. Civ.A.08–2016, 2009 WL 603160, at *4 (E.D. Pa. Mar. 5, 2009) (citing Daniels v. Williams, 474 U.S. 327, 341 (1987) (Stevens, J., concurring)).

In the present case, Plaintiff has not put forth any allegations to indicate that he had any entitlement to adjustment of status, particularly given § 1255(a)'s statement that adjustment of status is at the discretion of the Attorney General. See Mudric v. Attorney Gen. of U.S., 469

F.3d 94, 98 (3d Cir. 2006) ("While an alien may be eligible for a grant of asylum or an adjustment of status under the immigration laws, he is not entitled to such benefits as a constitutional matter. There is no constitutional right to asylum [or adjustment] per se."). Moreover, Plaintiff has not set forth any facts showing that he was deprived of any process to which he was entitled. Indeed, the facts are undisputed that Plaintiff had a hearing, received a NOID, and had the opportunity to submit a response and evidence to the agency. See Mathews, 424 U.S. at 333 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"). The only question is whether the agency decision was made under a proper construct of the controlling statutes. Accordingly, the Court must dismiss the procedural due process claim as well.

## IV. CONCLUSION

In light of the foregoing, the Court finds that Plaintiff's Motion for Summary Judgment must be granted and Defendants' Motion for Summary Judgment must be denied. Plaintiff is entitled to judgment on his claim for declaratory judgment under the Administrative Procedures Act, 5 U.S.C. § 706(2)(A) & (B). The case shall, therefore, be remanded to USCIS for further review consistent with this Memorandum.

An appropriate Order follows.